UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re: Devin J. Sherman,

                Debtor.

Case No. 15-30837
Chapter 7

John Baggett,

                Plaintiff,

v.

Devin J. Sherman,

                Defendant.

Adv. Proc. No. 15-50026

Appearances:

Stewart L. Weisman                 *for Plaintiff*
Law Office of Stewart L. Weisman
8060 Shadowrock Road
Manlius, NY 13104-0598

Theodore L. Araujo                 *for Defendant*
Bodow Law Firm
Bankruptcy Law Center
Nettleton Commons
313 East Willow St, Suite 105
Syracuse, NY 13203-1905

**Memorandum-Decision and Order**

Plaintiff John Baggett ("Plaintiff") filed this adversary proceeding against Debtor-Defendant Devin J. Sherman ("Debtor"), which seeks a determination that a debt of $130,109 ("Debt") is nondischargeable in Debtor's chapter 7 bankruptcy case pursuant to 11 U.S.C. § 523(a)(4).[1] The Debt arose in connection with a Homeowner Contract Agreement dated

---

[1] Unless otherwise stated, all sectional references are to Title 11 of the United States Code, the "Bankruptcy Code."

October 17, 2011, pursuant to which Debtor was to build a house for Plaintiff for $151,935 (the "Agreement" or "Contract"). Plaintiff terminated Debtor's services after Debtor told Plaintiff that he needed more money to complete the job. Plaintiff claims to have spent $282,044 to construct his home—more than $130,109 of the original contract price.[2] Plaintiff now claims that the Debt is nondischargeable, alleging that Debtor committed defalcation while acting in a fiduciary capacity by misappropriating trust funds under Article 3-A of the New York Lien Law ("Article 3-A"). Debtor answered the complaint by general denial that also raised affirmative defenses.

The court conducted a bench trial on August 16, 2016, at which both Plaintiff and Debtor testified. The parties stipulated to the admission of Plaintiff's exhibits and a statement of uncontested material facts ("Stipulated Facts").[3] At the conclusion of trial, the court invited supplemental post-trial briefs, which parties filed. This memorandum-decision incorporates the court's findings of fact and conclusions of law as permitted by Fed. R. Bankr. P. 7052. For the reasons discussed, the court finds the Debt dischargeable.

**Jurisdiction**

The court has jurisdiction to hear and decide this case pursuant to 28 U.S.C. §§ 1334(b), 157(b)(1) and 157(b)(2)(I), as consented to by the parties.

**Background Facts**

Plaintiff, a retired police officer with twenty-one years of service, wanted to have a house built for his family. He was referred to Debtor who was a mason with over twenty years of experience. Debtor is the sole shareholder of both Integrity Group, Inc. and Integrity Masonry

---

[2] At trial, Plaintiff testified to having spent a total of $410,000 on construction. The additional amount is attributable to a separate contract for materials, as discussed *infra*, that Plaintiff entered into with Hamilton Building Services at the outset of the Agreement.

[3] The court admitted Plaintiff's Exhibits 1–9 on consent of the parties, which include the Agreement, the contract with Hamilton Building Services for materials, an invoice from Hamilton Building Services, invoices from and checks submitted to third-party sub-contractors to finish the job after Plaintiff terminated the Contract with Debtor, the State Court complaint and judgment, and Debtor's Schedule F.

2

Division Corporation.[4] Plaintiff and Debtor first met in the fall of 2011 and executed the Agreement soon afterwards. The parties stipulated that during the relevant time period, Debtor contracted for and worked on other projects.

Pursuant to the Agreement, Plaintiff contracted for Debtor to build Plaintiff a house for $151,935 (the "Project"). Separately, Plaintiff entered into an agreement with Hamilton Building Services ("Hamilton") whereby Hamilton agreed to provide materials for the Project for an additional $151,599.92. For the sale of those materials to Plaintiff, Debtor earned a $35,000 commission from Hamilton. The whole Project, at the outset, was estimated to cost Plaintiff $303,534.92. Plaintiff secured a thirty-year mortgage commitment from Pathfinder Bank in the amount of $274,734 and anticipated paying the difference from his own funds.

This was the first house that Debtor contracted to build as a general contractor—having done only masonry work on individual projects or as a subcontractor in the past. Although Plaintiff was aware of Debtor's limited experience, Plaintiff did not consult any other general contractors nor did he procure any other quotes. Plaintiff testified that he and his wife felt comfortable hiring Debtor after meeting with him.

Plaintiff paid Debtor $10,000 to have the plans for the Project drawn up. The Project then commenced in January 2012. At that time, Debtor received $82,400 from Pathfinder Bank and an additional $42,000 directly from Plaintiff for supplies. Subsequently, Debtor asked Plaintiff for additional funds for road and electrical work. That cost increased because the required "setback" or distance from the home to the road was greater than that initially contemplated. Plaintiff paid Debtor an additional $21,000 in May of 2012—$14,000 towards the road construction and $7,000

---

[4] The court notes that although the Agreement lists the corporate entities as "Contractor," the Agreement is signed by Debtor in his individual capacity, and, as later explained, proceeds from the Agreement were deposited into Debtor's personal account. Accordingly, throughout this decision, Debtor is referenced as the party who contracted with Plaintiff, a fact consonant with the record before the court.

to pay National Grid to run electrical service from the road to the house. In June, Plaintiff followed up directly with National Grid, only to learn that National Grid had not received the requisite funds to do the work. National Grid informed Plaintiff that he would lose his scheduled service appointment to connect electricity to the house if payment was not received. Plaintiff then paid National Grid $7,000 directly.[5] The parties stipulated that Plaintiff made additional payments to Debtor, including $9,500 for septic work and $4,000 for an interior staircase.

Plaintiff testified that as Debtor continued to ask for additional funds he started to become suspicious. On numerous occasions, Plaintiff asked Debtor to see bills, receipts and canceled checks paid to sub-contractors. Plaintiff claims that Debtor continuously refused his requests but ultimately showed Plaintiff a typed spreadsheet, without the underlying documents to substantiate the numbers. When Debtor told Plaintiff in July 2012 that he needed an additional $40,000 to complete the Project, Plaintiff refused his request for further monies and terminated Debtor's Contract. Plaintiff then hired and paid new sub-contractors to complete the Project. Plaintiff estimates spending a total of approximately $410,000 to construct the house.

The parties have stipulated that the money paid to Debtor was to be held in trust, and Debtor was obligated to act in a fiduciary capacity in connection with the money paid to him by or on behalf of Plaintiff. Debtor admits that all the money received for the Project was not deposited into an escrow account, but, instead, was deposited into Debtor's Integrity Masonry Division checking account, which was also used as Debtor's personal checking account. During the relevant time period, a total of $222,950.74 in deposits were made to Debtor's account. The parties have stipulated that of these deposits $158,900 were identified as related to the Project. At trial, Debtor testified that he received and deposited a $35,000 earned commission paid by Hamilton on the

---

[5] This $7,000 was in addition to the initial $7,000 paid to Debtor for this work. Debtor ultimately repaid Plaintiff the $7,000 previously advanced.

4

materials used for the Project.[6] The evidence does not clearly delineate the full amount Debtor expended on the Project versus what Debtor used for personal expenses. However, Debtor admits to making personal expenditures of at least $35,543 while on the Project.

Plaintiff commenced a state court lawsuit and recovered judgment against Debtor for breach of contract in the amount of $130,109 plus interest and attorney's fees. Debtor filed chapter 7 bankruptcy and Plaintiff commenced this adversary proceeding to find the Debt nondischargeable.

## Legal Analysis

The United States Supreme Court has described bankruptcy as "a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). The purpose of the Bankruptcy Code is to provide this fresh start to the "honest but unfortunate debtor." *Grogan*, 498 U.S. at 287. In accordance with this principle, exceptions to discharge are to be strictly construed. *Zohlman v. Zoldan*, 226 B.R. 767, 777 (S.D.N.Y. 1998). As the Second Circuit has stated:

> The consequences to a debtor whose obligations are not discharged are considerable; in many instances, failure to achieve discharge can amount to a financial death sentence. In view of these harsh consequences, exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor.

*Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007) (citing *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000).

---

[6] Debtor's testimony is supported by a deposit into his account of $35,669.85 on April 9, 2012.

*Section 523(a)(4)—Defalcation While Acting in a Fiduciary Capacity*

Section 523(a)(4) provides that a discharge under § 727 does not discharge a debtor from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C.A. § 523(a)(4). Plaintiff claims that Debtor misappropriated trusts funds when he commingled Project funds with monies in his personal checking account and made unauthorized personal expenditures and withdrawals. This misappropriation is alleged to constitute "defalcation" under § 523(a)(4).

Defalcation is related to but is distinct from its statutory neighbors of "fraud," "embezzlement," and "larceny." *Bullock v. BankChampaign, N.A.*, __ U.S. __ , 133 S. Ct. 1754, 1760 (2013). "'Defalcation,' as commonly used ... can encompass a breach of fiduciary obligation involving neither conversion, nor taking and carrying away another's property, nor falsity." *Id.* As the Supreme Court has found, the state of mind required for "defalcation" involves knowledge of, or gross recklessness in respect to, the aberrant or improper nature of the behavior as related to one's fiduciary duty. *Id.* at 1757.

In order to establish that debt is nondischargeable within this section, a plaintiff must show: (1) an actual or express trust giving rise to a fiduciary relationship, (2) that a debtor acted as a fiduciary with respect to plaintiff, and (3) that a debtor committed an intentional defalcation in the course of that fiduciary relationship to create the debt. *In re Hayes,* 183 F.3d 162, 167 (2d Cir. 1999)) *cert. denied,* 555 U.S. 1097 (2009); *White's Lumber v. Spies (In re Spies),* No. 09-30283-MCR, 2011 WL 3295440, at *7. (Bankr. N.D.N.Y. July 29, 2011) (analyzing an alleged defalcation by misappropriation under New York's Lien Law). Plaintiff bears the burden of establishing these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. at 291.

6

As a result of his Contract with Plaintiff and his receipt of Plaintiff's funds, Debtor is a contractor as defined by New York law, having an obligation to deposit construction project funds in a trust account for the benefit of Plaintiff as owner. N.Y. Lien Law Article 1 § 2, subd. 9 (defining "contractor" as "a person who enters into a contract with the owner of real property for the improvement thereof ...."); Article 3-A § 70, subds. 1 & 3 (providing that funds received by a contractor, so defined, are assets of a trust commencing at the time any assets thereof come into existence); *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 18–19 (Bankr. S.D.N.Y. 2002) (holding that "owners are beneficiaries under the trusts created by statutes like Article 3–A of the New York Lien Law.") (citing cases). It is uncontested that elements one and two of Plaintiff's defalcation claim have been established which the court so finds.[7]

As for the third element, Plaintiff must establish an act of defalcation with the requisite *scienter*. The court recognizes the inference of misappropriation that arises due to Debtor's failure to maintain records comporting with the stricture of Article 3-A § 75 subd. 3.[8] Therefore, the

---

[7] While Debtor offered testimony that he believed he was entitled to withdraw an undefined portion of the trust funds as income earned on the project, this belief, even if sincere, is not a legal justification of the act of misappropriation. *See In re Spies*, 2011 WL 3295440, at *19 (rejecting the argument that the contractor "was entitled to pay himself for his direct work on the Project) (citing *Louis Greenberg, Inc. v. Instant Heat & Power Corp.*, 33 Misc. 2d 1081, 1082 (N.Y. Sup. Ct. 1962) ("The recipient of the trust funds holds them for the benefit of the sub-claimants on the improvement, who are enumerated in the statute, and is entitled to any remainder *only* after the payment of their claims")). Debtor listed outstanding debts owing to Project subcontractors—$1,000 to Cook Construction & Restoration and $31,543 to Fleetwall Drywall, Inc.—in Schedule F of his Petition. Thus, Debtor was not entitled to take any portion of the trust funds as "income."

[8] Plaintiff is entitled to an inference that Debtor diverted trust funds due to his failure to maintain records comporting with the strictures of Article 3-A § 75 subd. 3. As a trustee, Debtor was obligated to maintain books and records sufficient to identify: (1) trust assets receivable; (2) trust accounts payable; (3) trust funds received; and (4) trust payments made with trust assets. Article 3-A § 75, subd. 3. Other than the bank records supplied, Debtor made no attempt to produce associated invoices for expenses, materials, labor costs, equipment rentals, and other payments made on account of the expenses incurred on the Project. While Debtor's bank records do show the disbursements of comingled funds, without other supporting documentation it is impossible to tell whether a number of the entries were for personal expenses, business expenses unrelated to the Project or Project expenses.

7

court's sole focus is on whether Plaintiff has established that Debtor committed an intentional wrong under the *mens rea* standard established by *Bullock*.

*The Scienter Requirement of Defalcation*

Defalcation requires "an intentional wrong," which includes both knowingly improper and reckless behavior, such as when a fiduciary "'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty" and that risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Bullock*, 133 S. Ct. at 1760 (quoting Model Penal Code § 2.02(2)(c) (1985)). Post-*Bullock*, a Debtor's knowledge of and intentional wrong to violate a statutory duty, such as Debtor's duties under Article 3-A of New York's Lien law, may not be simply inferred from a misappropriation of trust funds alone. *See In re Cupit*, 514 B.R. at 51 (citing Jonathon S. Byington, *The Challenges of the New Defalcation Standard*, 88 AM. BANKR. L. J. 3, 31 (2014)).

Post-*Bullock* case law indicates a number of non-exclusive factors relevant to whether or not defalcation may be inferred. These include: Debtor's knowledge of his status as a fiduciary or knowledge of statutory trusts creating fiduciary duties, the presence or absence of a repeated pattern of conduct, and the sophistication of Debtor. *Compare, e.g., In re Patel*, 565 F.3d 963, 971 (6th Cir. 2009) (looking to an experienced contractor's "woefully inadequate" accounting and payment of operating expenses, including his own wages, as important factors in finding defalcation); *In re Hartung*, 511 B.R. 538, 550 (E.D. Wis. 2014) (finding defalcation based on a knowing removal of escrowed insurance proceeds for personal purposes); *In re Palilla*, 493 B.R. 248, 252–53 (Bankr. D. Colo. 2013) (inferring intent to commit defalcation from a repeated pattern

8

of conduct) *with In re Cupit*, 514 B.R. 42, 59-60 (intent to commit defalcation not established for a portion of the misappropriation occurring when the debtor testified he was unaware of the relevant trust fund statute despite the misappropriation creating a substantial and unjustified risk of breaching his duties under the statute); *In re St. Antoine*, 533 B.R. 743, 749-50 (Bankr. E.D. Wis. 2015) (finding a failure to show deliberate action on the part of debtors necessary for willful blindness where debtors testified to ignorance of the lien law and had "merely" relied on a lien enforcement form from the internet).

The court finds the following facts relevant to its *mens rea* analysis. The Project was Debtor's first as a general contractor and his first attempt at building an entire home. Debtor did not consult with an attorney prior to entering into the Agreement, the model for which he found on the internet. Debtor made no representation to Plaintiff that the funds would be deposited into a trust account. The court accepts the Debtor's testimony that he sincerely believed that he was 'drawing pay.' While this belief is no defense to the claim of defalcation under the New York Lien Law, this belief is relevant to the *mens rea* analysis.

Plaintiff did not establish that Debtor had actual knowledge of his fiduciary obligations under New York's Lien Law nor does the record support an inference of such knowledge. There is no indication that Debtor's experience in the construction trades had alerted him to his fiduciary duties under the statute. Further, the record demonstrates that there were additional deposits into Debtor's bank account from sources other than those made on or on behalf of Plaintiff.[9] Thus,

---

[9] The parties stipulated that $158,900 of the deposits into Debtor's account were related to the Project. The record does not explain the nature or source(s) of the approximate balance of $64,000, except for the $35,000 commission paid directly to Debtor by Hamilton. This earned commission paid by a third party did not constitute trust funds to be held for the benefit of Plaintiff.

9

while Debtor comingled funds, Debtor had other monies that were not trust funds of the Plaintiff to cover the $35,543 of personal expenditures and withdrawals.

From the testimony elicited, the court finds that Debtor's misappropriation resulted from a variety of factors—his unsophistication and lack of knowledge regarding his duties under the Lien Law, his inaccurate bidding of the construction contract, his failure to properly anticipate cost-overruns and change orders, and his failure to appreciate the applicable zoning requirements—rather than from any malice on his part. The spending pattern in Debtor's comingled account consists primarily of small-scale purchases for gas, lunch, and other every-day necessities. Although Debtor did incur approximately five thousand dollars of expenditures in relation to his wedding, these larger expenses were an exception to the overall pattern. They appear to be driven not by any wrongful intent, but by Debtor's erroneous but sincere belief that he was entitled to a portion of the contract price as income. This case does not present the typical scenario of a misbehaving contractor who, in the course of juggling multiple jobs, comingles different clients' funds, and robs Peter to pay Paul. Here, poor planning doomed the project and both Plaintiff and Debtor suffered as a consequence.[10]

Notwithstanding the fact that that there was a clear violation under Article 3-A of New York State Lien Law in the comingling of personal and trust funds and the application of those

---

[10] Plaintiff seeks a determination that all breach-of-contract damages under the Agreement, including consequential damages, are non-dischargeable. However, Plaintiff's increased costs could have resulted from increases in the cost of materials, differences in the skill of the new subcontractors or other unforeseen circumstances, such as the alleged "set-back" issue that related to the additional $7,000 payment to National Grid. Without this showing, the defalcation analysis is limited to the amounts that Debtor misappropriated for his personal or non-project use. *See In re Dobrayel*, 287 B.R. 3, 24 (Bankr. S.D.N.Y. 2002) ("[N]othing in the Bankruptcy Code provides for non-dischargeability of a debt for breach of contract. Nor is there any causal connection between [debtor's] fraud, deceit and false pretenses which began in September 1998 and the cost to complete the project after [debtor] quit.").

funds for personal use prior to the payment in full of all trust beneficiaries, from the evidence before the court, the court does not find the requisite *scienter* or gross recklessness on the part of the Debtor to sustain finding the Debt nondischargeable. The court found Debtor's testimony credible and straightforward. This was Debtor's first experience acting as a general contractor and the court does not infer the presence of the requisite malice or ill will necessary to conclude that Debtor intentionally diverted Plaintiff's funds in violation of his fiduciary duties.

This is not to say that the court is not sympathetic to the plight of the Plaintiff who relied upon his original funds on hand supplemented by available financing to anticipate the budget needed for building a house for his family. Nevertheless, notwithstanding Debtor's misappropriation of funds, the quoted budget was, apparently, short-sighted—a fact which Plaintiff might have realized at the outset of the Project had he solicited competing bids with the exercise of a little due diligence.

## CONCLUSION

For the forgoing reasons, the court finds the Debt dischargeable and shall issue a separate judgment dismissing the complaint in accordance with Fed. R. Bankr. P. 9021.

So Ordered,

Dated: March 7, 2016         Margaret Cangilos-Ruiz
Syracuse, New York           United States Bankruptcy Judge

11